**Opinion issued November 13, 2025.**



**In the**

# Court of Appeals

**for the**

# First District of Texas

_____

**NO. 01-24-00048-CV**
_____

**6CATS INTERNATIONAL LTD. and CXC GLOBAL (EUROPE) LTD.,**
**Appellant**

**v.**

**WILLIAM HARTLEY, Appellee**

**On Appeal from the 164th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-03171**

## MEMORANDUM OPINION

Appellant 6CATS International Ltd. (6CATS), a private limited company
with its principal place of business in London, and appellant CXC Global (Europe)
Ltd. (CXC), which was a private limited company incorporated in England and
Wales with a registered office in London, take this interlocutory appeal from the

trial court's denial of their special appearance. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(7) (authorizing interlocutory appeal of order denying special appearance). 6CATS and CXC contend that the trial court lacks personal jurisdiction over them and thus erred in denying their special appearance.

We reverse the trial court's order denying 6CATS and CXC's special appearance and render judgment dismissing the claims brought by appellee William Hartley against 6CATS and CXC, without prejudice, for lack of jurisdiction.

## Background

Hartley is a Louisiana resident. Hartley claims that he was injured in May 2015 while working on the *PetroSaudi Saturn*, a drillship anchored off the coast of Trinidad and Tobago. Hartley contends that, at the time of his injury, he was employed by CXC, an entity he alleges is now known as 6CATS. In 2018, Hartley filed suit in Harris County against various entities he claimed employed him and, in some combination, managed, operated, and crewed the drillship on which he worked. In his Second Amended Petition, Hartley added CXC as a defendant, asserting in part that CXC had employed him as a welder and crew member on the drillship and owes him maintenance and cure obligations in Texas under the Jones Act, 46 U.S.C. § 30104 *et seq*. In his Fourth Amended Petition, Hartley added 6CATS as a defendant, alleging in part that 6CATS is CXC's alter ego.

## A.     6CATS/CXC's Special Appearance

On June 6, 2022, 6CATS filed a special appearance on behalf of itself and CXC in which it argued that neither company had ever employed Hartley or submitted to personal jurisdiction in Texas. 6CATS alleged that CXC ceased to exist in 2016 when it was purchased by investors who formed 6CATS. 6CATS asserted that CXC had been based in the United Kingdom and had only provided payment processing services for Hartley. 6CATS stated further that it is based in the United Kingdom, and did not yet exist at the time Hartley was allegedly injured.

In response to Hartley's allegation that 6CATS and CXC owe maintenance and cure obligations to him in Texas under the Jones Act, 6CATS complained that Hartley had not provided any factual basis for that claim. 6CATS argued that neither CXC's contract with Hartley nor any other conduct by CXC made Hartley a CXC employee, and that CXC had never conducted any business in Texas. 6CATS alleged that CXC had "served as a payment processor for transactions executed between" staffing agency Spencer Ogden, Inc. (Spencer Ogden)[1] and

---

[1]     According to Spencer Ogden's parent company, Spencer Ogden International Ltd., Spencer Ogden, Inc. is a Texas corporation with its principal place of business in Houston, Texas.

PetroSaudi Oil Services Ltd. (PetroSaudi)[2] "in facilitation of [Hartley's] temporary assignment as a contractor for PetroSaudi in Panama City." 6CATS attached to its special appearance a copy of the April 14, 2015 Payment Processing Contract between CXC and Hartley (the CXC/Hartley Contract). As additional support, 6CATS submitted the declaration of Michelle Reilly, 6CATS's chief executive officer. Reilly stated in part that CXC "entered a contract with . . . Hartley, a Louisiana resident, to provide payment processing services for his work in or near Panama or Trinidad and Tobago through staffing agency, Spencer Ogden, on the drilling rig and/or ship known as the M/V PetroSaudi Saturn."

The CXC/Hartley Contract states that it is to be governed by and construed in accordance with the laws of England. It provides that it "is a Contract for payment processing services and under no circumstances should it be interpreted as a contract of employment." However, the CXC/Hartley Contract also states that it "confirms the engagement of [Hartley] by [CXC] and sets out the terms and conditions of that engagement." The CXC/Hartley Contract states that PetroSaudi is the third-party client of CXC to which Hartley "shall render the activities as per defined by this Contract and its Assignment Schedule."

---

[2] In a related appeal, this Court previously held that Texas courts have general jurisdiction over PetroSaudi, which has an office in Houston. *PetroSaudi Oil Services Ltd. v. Hartley*, 617 S.W.3d 116, 141 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (*Hartley I*).

The Assignment Schedule is a schedule to the CXC/Hartley Contract that states that Hartley is "the Consultant"; PetroSaudi is "the Client"; the "specified project function" is "Welder Duties"; the "Recruitment agency" is Spencer Ogden; the "project" start and end dates are April 10, 2015 and May 1, 2015; the "project location" is Panama; the "project fees" are "$400 per day (Standard)" and "$33.33 per hour (Non-standard)"; the "notice clause" is "[a]s per Spencer Ogden contract"; and the "CXC Margin" is "3% capped at $65 per week." The Assignment Schedule included in the copy of the CXC/Hartley Contract attached to 6CATS/CXC's special appearance and Hartley's response is signed by Reilly and also includes a place for Hartley to sign.

In her declaration, Reilly also denied that 6CATS or CXC had any of a wide variety of possible jurisdictional contacts with Texas. For example, Reilly denied that either company had ever owned any assets or real estate in Texas, or had an office, mailing address, employee, agent, or bank account in the state. Reilly also denied that either company had ever conducted business within Texas or directed any marketing to Texas.

**B. Hartley's Amended Petition and Response to 6CATS/CXC's Special Appearance**

Hartley filed his response to 6CATS and CXC's special appearance on March 14, 2023, and amended his petition that same day. In his amended petition, Hartley alleged that the trial court had both general and specific jurisdiction over

5

6CATS and CXC because PetroSaudi owned and operated the *PetroSaudi Saturn*; PetroSaudi, through Spencer Ogden, solicited, hired, and employed workers for the vessel; Spencer Ogden contracted with CXC to provide workers such as Hartley for the vessel; and PetroSaudi contracted with Spencer Ogden to train Hartley and provide medics to perform emergency medical treatment. Hartley alleged that 6CATS and CXC were "obligated to pay medical expenses and/or maintenance and cure, and failed to do so, either negligently or intentionally, pursuant to those obligations, within Harris County and the State of Texas." Hartley alleged further that 6CATS and CXC were alter egos.

In his response to 6CATS and CXC's special appearance, Hartley alleged that Hartley agreed to work for PetroSaudi pursuant to the CXC/Hartley Contract's Assignment Schedule. Hartley alleged further that Houston-based recruitment agency Spencer Ogden "linked Hartley and CXC together" pursuant to an April 2015 agreement between Spencer Ogden and CXC (the Spencer Ogden Contract), which Hartley made an exhibit to his response. The Spencer Ogden Contract is titled "Assignment Schedule" and, like the CXC/Hartley Contract, states that it is to be construed in accordance with English law. The parties also agreed that any disputes related to the Spencer Ogden Contract would be subject to the exclusive jurisdiction of English courts.

The Spencer Ogden Contract begins with language similar to that in the Assignment Schedule included in the CXC/Hartley Contract, but states that the "Name of Contractor Ltd" is CXC, that Hartley is the "Representative of the Contractor," and that the services to be provided by CXC are "[t]o assist [PetroSaudi] with Welder duties and other assignments as required." Spencer Ogden is referenced in the agreement as the "Employment Business" and PetroSaudi as the "Client."

Hartley argued that his claims arise from business activities that CXC conducted in Texas including: (1) contracting with Spencer Ogden in Texas, (2) sending Hartley to work on a vessel owned by PetroSaudi, (3) sending Hartley to work on a vessel operated by PetroSaudi and its Texas-based subsidiary, Procurement Services (Delaware), Inc., and (4) performing work directly related to services provided by Hartley in Texas.

## C.  6CATS and CXC's Reply in Support of Their Special Appearance

6CATS filed on its own and CXC's behalf a May 16, 2023 reply to Hartley's response to 6CATS and CXC's special appearance. 6CATS attached a second declaration from Reilly. Reilly stated in part that an England-based affiliate of Spencer Ogden, Spencer Ogden Limited, had regularly engaged CXC to perform payroll processing services for workers who performed work outside the United States. She stated that it was Spencer Ogden Limited's decision to have the

7

Spencer Ogden Contract "channeled to" the Texas-based Spencer Ogden, that CXC had not contacted the Texas-based entity of its own accord, and that CXC had provided in England all its payroll processing services for Hartley.

6CATS argued in part that Spencer Ogden Limited's channeling of the Spencer Ogden Contract to Texas-based Spencer Ogden was unilateral activity by Spencer Ogden Limited. 6CATS denied that CXC had done any business with PetroSaudi or "sent" Hartley anywhere. 6CATS stated that, as Spencer Ogden Limited staffed projects, it would link CXC to independent contractors so that CXC could provide them payroll processing services. 6CATS argued that CXC's connection to Spencer Ogden was not substantially connected to Hartley's alleged injury and thus could not support the exercise of specific jurisdiction over CXC. 6CATS noted Spencer Ogden Contract's choice-of-law and forum-selection provisions, the latter of which gave English courts exclusive jurisdiction over any dispute related to the agreement, as further support for its position that it was not foreseeable to CXC that it would be brought into a Texas court in connection with the Spencer Ogden Contract.

## Special Appearance

In their sole issue, 6CATS and CXC challenge the trial court's denial of their special appearance.

## A.    Standard of Review

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law that we review de novo. *LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341, 346 (Tex. 2023); *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018). When, as here, the trial court did not issue findings of fact and conclusions of law, all relevant facts that are necessary to support the judgment and supported by evidence are implied. *Bell*, 549 S.W.3d at 558. We presume that the trial court resolved all factual disputes in favor of its ruling. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 871-72 (Tex. 2010). When, as here, the appellate record includes the reporter's record, the appellant may challenge the legal and factual sufficiency of the evidence supporting implied findings in the same manner as if they were jury findings or express findings by the trial court. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017).

We review any challenged factual findings using the same standards that we use to review jury findings. *Hartley I*, 617 S.W.3d at 132 (citing *Washington DC Party Shuttle, LLC v. IGuide Tours, LLC*, 406 S.W.3d 723, 729 (Tex. App.— Houston [14th Dist.] 2013, pet. denied)). When reviewing a finding for legal sufficiency, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding. *Id.* (citing *Washington DC Party Shuttle*, 406 S.W.3d at 729). We credit favorable evidence if

a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* (citing *Washington DC Party Shuttle*, 406 S.W.3d at 729). Evidence is legally insufficient to support the implied finding only if: (1) the record bears no evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Bradberry*, 526 S.W.3d at 480.

When we review the factual sufficiency of the evidence supporting an implied finding, we consider all the evidence and will set aside the finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Hartley I*, 617 S.W.3d at 133 (citing *Washington DC Party Shuttle*, 406 S.W.3d at 729). If the evidence supports the implied fact finding, we must uphold the trial court's judgment on any legal theory supported by the evidence. *Id.* (citing *Washington DC Party Shuttle*, 406 S.W.3d at 729).

**B.    Exercise of Personal Jurisdiction**

Texas courts may exercise personal jurisdiction over a nonresident defendant if (1) the Texas long-arm statute authorizes it and (2) doing so comports with federal and state due-process guarantees. *Goldstein v. Sabatino*, 690 S.W.3d 287, 294 (Tex. 2024) (citing *Bell*, 549 S.W.3d at 558). The long-arm statute permits

Texas courts to exercise jurisdiction over a nonresident defendant that "does business" in Texas. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). Under the long-arm statute, a nonresident does business in Texas if, "[i]n addition to other acts that may constitute doing business," the nonresident (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in Texas; (2) commits a tort in whole or in part in Texas; or (3) recruits Texas residents, directly or through an intermediary located in Texas, for employment inside or outside of Texas. TEX. CIV. PRAC. & REM. CODE § 17.042.

Personal jurisdiction over a nonresident defendant is constitutional if: (1) the defendant has established minimum contacts with the forum state and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *BMC*, 83 S.W.3d at 795 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). A defendant establishes minimum contacts with a forum state if it purposefully avails itself of the privileges and benefits of conducting business within the forum state. *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

A defendant's contacts with the forum may give rise to either general or, as at issue here, specific jurisdiction.[3] *Bell*, 549 S.W.3d at 559. Specific jurisdiction applies to defendants less closely connected with the forum state, but only as to a narrower class of claims than general jurisdiction would cover. *BRP-Rotax GmbH & Co. v. Shaik*, 716 S.W.3d 98, 104 (Tex. 2025) (citing *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 359, 141 S.Ct. 1017, 209 L.Ed.2d 225 (2021)). Specific jurisdiction exists only if the alleged liability arises out of or is related to the nonresident defendant's activity within the forum. *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 430 (Tex. 2023). An affiliation must exist between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum state and is therefore subject to the state's regulation. *Id.* (citing *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 137 S. Ct. 1773, 1780, 198 L.Ed.2d 395 (2017)). That relationship does not have to be causal. *Id.* at 430-31 (citing *Ford*, 141 S.Ct. at 1026). However, the jurisdictionally relevant activities must be the defendant's own choice and must justify a conclusion that the nonresident defendant could reasonably anticipate being called into a Texas court with respect to a particular claim. *BRP-Rotax*, 716 S.W.3d at 104 (citing *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002)).

---

[3] Hartley states on appeal that he "asserts only specific jurisdiction."

When personal jurisdiction is challenged, the plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the scope of Texas's long-arm statute. *Bell*, 549 S.W.3d at 559. The trial court may consider the plaintiff's original pleadings as well as the plaintiff's response to the defendant's special appearance in determining whether the plaintiff satisfied that initial burden. *Graves v. DJO, LLC*, 636 S.W.3d 321, 325 (Tex. App.—Fort Worth 2021, pet. denied); *Hartley I*, 617 S.W.3d at 135. In conducting our review, we accept as true the plaintiff's pleadings and allegations. *Pulmosan Safety Equip. Corp. v. Lamb*, 273 S.W.3d 829, 835 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (noting that, "[i]n determining jurisdictional pleas asserted by a defendant, we take as true the pleadings and allegations of the plaintiff and review the pleadings and allegations in the light most favorable to the plaintiff")). If the plaintiff fails to plead facts bringing the defendant within the reach of the long-arm statute, the defendant need only prove that it does not live in Texas to negate jurisdiction. *Hartley I*, 617 S.W.3d at 135 (citing *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658-59 (Tex. 2010)).

If the plaintiff meets its initial pleading burden, the burden shifts to the defendant to negate all bases of personal jurisdiction alleged by the plaintiff. *LG Chem Am., Inc. v. Morgan*, 663 S.W.3d 217, 230 (Tex. App.—Houston [1st Dist.] 2020) (citing *Bell*, 549 S.W.3d at 559), *aff'd*, 670 S.W.3d 341 (Tex. 2023). The

defendant can negate jurisdiction on either a factual or a legal basis. *Id.* (citing *Kelly*, 301 S.W.3d at 659). Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. *Id.* (citing *Kelly*, 301 S.W.3d at 659). The plaintiff can then respond with its own evidence affirming its allegations and, if it does not present evidence establishing personal jurisdiction, it risks dismissal of its suit. *Id.* (citing *Kelly*, 301 S.W.3d at 659). The defendant is then allowed to show that, even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas do not constitute purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts with Texas; or that the exercise of jurisdiction offends traditional notions of fair play and substantial justice. *Id.* (citing *Kelly*, 301 S.W.3d at 659).

If the defendant produces credible evidence negating all bases of jurisdiction, the plaintiff bears the ultimate burden to establish that the Texas court has personal jurisdiction over the defendant as a matter of law. *Hartley I*, 617 S.W.3d at 135; *Riviera Operating Corp. v. Dawson*, 29 S.W.3d 905, 908 (Tex. App.—Beaumont 2000, pet. denied).

## C.    Minimum Contacts

6CATS and CXC argue on appeal that, even if Hartley's alleged facts are true, their contacts with Texas do not constitute purposeful availment and Hartley's

claims do not arise from those contacts. *See Morgan*, 663 S.W.3d at 230 (citing *Kelly*, 301 S.W.3d at 659). Because those issues are determinative, we begin our analysis there.

6CATS and CXC's position on appeal is that they did not purposefully avail themselves of the privileges and benefits of conducting business within Texas because (1) the Spencer Ogden Contract is not a purposeful contact between CXC and Texas; (2) even if it was, CXC's contacts cannot be imputed to 6CATS under alter-ego or joint-enterprise theories; and (3) Hartley's unilateral decision to seek medical treatment for his injuries in Houston did not subject CXC or 6CATS to jurisdiction in Texas.

Hartley argues in response, as he did in response to 6CATS and CXC's special appearance, that CXC purposefully availed itself of the privilege of conducting business in Texas, not just by contracting with Spencer Ogden, but also by (1) sending Hartley to work on a vessel owned by PetroSaudi, (2) sending Hartley to work on a vessel operated by PetroSaudi and its Texas-based subsidiary, and (3) performing work directly related to services provided by Hartley in Texas. Hartley argues that the trial court's denial of 6CATS and CXC's special appearance is also supported by additional facts beyond those he alleged in his pleading and response to the special appearance. Hartley argues further that 6CATS and CXC failed to negate in the trial court all of the jurisdictional bases he

15

alleged, and failed to challenge on appeal the trial court's implied finding either that CXC's jurisdictional contacts are 6CATS's contacts or that such contacts are attributable to 6CATS.

6CATS and CXC's position is that they did negate in the trial court all of Hartley's alleged grounds for jurisdiction and that, in reviewing the trial court's denial of their special appearance, this Court should not consider any "new" evidence that Hartley argues for the first time on appeal also supports the trial court's ruling.

Hartley's claim that specific jurisdiction exists over CXC is based on contacts that he alleges CXC had with Texas in connection with the Spencer Ogden Contract. While the only "worker" referenced by name in the Spencer Ogden contract is Hartley, Hartley alleges that CXC contracted with Spencer Ogden to "provide workers for the PetroSaudi Saturn" and that Spencer Ogden obtained the workers, including Hartley, from CXC. Hartley alleges further that he agreed to work for PetroSaudi "[p]ursuant to" the CXC/Hartley Contract's Assignment Schedule. 6CATS concedes that Spencer Ogden is based in Texas, and does not dispute that Spencer Ogden may have performed in Texas its obligations under the Spencer Ogden Contract. But 6CATS argues that, by entering into the Spencer Ogden Contract, CXC did not purposefully avail itself of the privileges and benefits of doing business in Texas.

Contracting with a resident of the forum state does not on its own establish sufficient minimum contacts in the forum state. *See Burger King*, 471 U.S. at 478 (holding that "an individual's contract with an out-of-state party alone" does not "automatically establish sufficient minimum contacts in the other party's home forum"). Nor can the resident counterparty's "unilateral activity" in performance of the contract amount to purposeful availment by the specially appearing nonresident. *M&F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc*., 512 S.W.3d 878, 886, 889 (Tex. 2017); *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785, 787 (Tex. 2005); *see also Auto-Owners Ins. Co. v. Millionder*, No. 01-24-00221-CV, 2025 WL 375847, at *8 (Tex. App.—Houston [1st Dist.] Feb. 4, 2025, no pet.) (mem. op.) (stating that plaintiff's unilateral activity in carrying out terms of contract is insufficient to establish minimum contacts giving rise to specific jurisdiction).

Instead, the question is whether, based on the contracting parties' prior negotiations, contemplated future consequences, the terms of the contract, and the parties' actual course of dealing, the nonresident purposefully established minimum contacts within the forum state. *Burger King*, 471 U.S. at 479; *TeleVentures, Inc. v. Int'l Game Tech*., 12 S.W.3d 900, 909 (Tex. App.—Austin 2000, pet. denied); *see also Jay Zabel & Associates, Ltd. v. Compass Bank*, 527 S.W.3d 545, 555 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (listing same

17

factors as factors that courts have considered in evaluating purposeful availment). For example, the inclusion of a foreign choice-of-law or forum-selection clause suggests that no local availment was intended. *See M&F Worldwide*, 512 S.W.3d at 889 (holding that specific jurisdiction did not exist over defendants who contracted with Texas residents based on factors including parties' agreement to New York choice-of-law and forum-selection clauses (citing *Michiana*, 168 S.W.3d at 792 (noting that "insertion of a clause designating a foreign forum suggests that no local availment was intended"))).

The record on appeal does not include any discussion of the negotiation of the Spencer Ogden Contract beyond Reilly's testimony that Spencer Ogden Limited, the English company with which CXC typically contracted, channeled the agreement to Spencer Ogden. While Spencer Ogden is a Texas company, the Spencer Ogden Contract does not expressly contemplate CXC or Hartley's performing any act in Texas. The Spencer Ogden Contract states that it is to be construed in accordance with the laws of England, one of the two British countries in which CXC was incorporated, and that all disputes between the parties shall be subject to the exclusive jurisdiction of English courts.

### 1. CXC's alleged obligation to provide maintenance and cure in Texas

Hartley nevertheless argued in the trial court that, in the Spencer Ogden Contract, CXC agreed to provide maintenance and cure benefits to Hartley in

18

Texas under the Jones Act.[4] Hartley alleged that he demanded such benefits from CXC after receiving medical treatment in Texas, and that CXC refused to provide those benefits. On appeal, Hartley argues that the trial court's denial of the special appearance supports his claim that CXC contracted to provide him Jones Act benefits in Texas and that 6CATS and CXC failed to negate the claim as a basis for exercising jurisdiction over 6CATS and CXC.[5] 6CATS notes that, even if Hartley's claim was sufficient to shift the burden to it to negate the alleged jurisdictional basis, 6CATS did so.

We do not reach the question of whether Hartley's claim that CXC contracted to provide him Jones Act benefits in Texas[6] was sufficiently alleged to

---

[4]      The contract language on which Hartley relies is broad language such as CXC's alleged promises to "observe and comply with all applicable laws [and] regulations," provide its services "in compliance with all relevant laws and regulations," "adhere to applicable laws, statutes and regulations," and "comply with any statutory or other reasonable rules or obligations including but not limited to those relating to health and safety." None of the cited language includes any express reference to Texas, to any other state, or to any United States law, including the Jones Act.

[5]      To the extent Hartley also argues that the trial court impliedly resolved in his favor any dispute over his claim, that argument misinterprets the applicable law, which applies to issues of fact. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018) (discussing circumstances under which relevant facts necessary to support trial court's judgment and supported by evidence are implied); *Spir Star AG v. Kimich*, 310 S.W.3d 868, 871-72 (Tex. 2010) (noting that reviewing court presumes that trial court resolved all factual disputes in favor of its judgment).

[6]      Specifically, Hartley references his claim that: "[6CATS] was obligated to pay medical expenses and/or maintenance and cure, and failed to do so, either negligently or intentionally, pursuant to those obligations, within Harris County

require negation by 6CATS and CXC. *See Morgan*, 670 S.W.3d at 346 (noting that plaintiff bears initial burden to plead "sufficient allegations" to bring defendant within reach of long-arm statute, that defendant then must negate all bases of personal jurisdiction "alleged" by plaintiff, and that defendant can do so by presenting evidence contradicting plaintiff's factual allegations or by showing that, even if such facts are true, such evidence is legally insufficient to establish personal jurisdiction). Even assuming 6CATS and CXC were required to negate that claim, 6CATS did so. *See id.* at 230 (stating that nonresident defendant can negate jurisdiction on either factual or legal basis). 6CATS argued in the trial court that the Spencer Ogden Contract was insufficient to satisfy the specific jurisdiction standard because, in that contract, CXC did not purposefully avail itself of the benefits of doing business in Texas. Even assuming that CXC agreed in the Spencer Ogden Contract to provide maintenance and cure benefits to Hartley under the Jones Act (despite the parties' agreement that their contract would be governed by English law), that agreement alone would not constitute a relevant jurisdictional contact with Texas.[7] The alleged Texas connection is provided by Hartley's

_____

and the State of Texas, and therefore the cause or causes of action against said Defendant arose within Harris County and the State of Texas."

[7]   Even a hypothetical agreement to pay *in Texas* Hartley's cure and maintenance would be, on its own, insufficient to show purposeful availment of the benefits of doing business in Texas. *See KC Smash 01, LLC v. Gerdes, Hendrichson, Ltd., L.L.P.*, 384 S.W.3d 389, 394 (Tex. App.—Dallas 2012, no pet.) (noting that

obtaining medical treatment in Texas, and there was no allegation or evidence CXC or 6CATS was involved in the decision that Hartley would obtain treatment in Texas—meaning this connection is of little or no jurisdictional relevance. *See Michiana*, 168 S.W.3d at 787.[8] Hartley cites *Potts v. Cameron Offshore Boats, Inc.*, 401 F. Supp. 2d 733 (S.D. Tex. 2005), for the proposition that paying maintenance and cure in a state is a purposeful contact with that state. But the court in *Potts* held only that "[p]aying maintenance and cure in [a] state is a purposeful contact with that state." *Id.* at 737 (noting further that such action cannot alone sustain personal jurisdiction). Here, CXC did not make maintenance and cure payments in Texas.

---

sending payments to Texas does not establish minimum contacts, and holding that defendant's agreement to make payments that defendant knew would be due in Texas also did not establish minimum contacts because, "if the acts themselves fail to establish minimum contacts and purposeful availment, the defendant's knowledge of the relationship to Texas will not make the defendant amenable to jurisdiction").

[8] For the same reason, CXC's refusal to pay for the medical care Hartley received in Texas is not jurisdictionally relevant. *Cf. Tarasewicz v. Royal Caribbean Cruises Ltd.*, No. 14-CIV-60885, 2015 WL 3970546, at *6 (S.D. Fla. June 30, 2015) (refusing to apply United States law to maritime claims based on factors including place of allegedly wrongful acts, noting that place of alleged failure to provide maintenance and cure for purposes of analysis was where plaintiff was physically injured and not where plaintiff received medical care or where defendant was located when it refused to provide maintenance and cure (citing *Vasquez v. YII Shipping Co.*, 2011 WL 5119006, at *1 (S.D. Fla. Oct. 28, 2011), *vacated*, 692 F.3d 1192 (11th Cir. 2012); *Vasquez v. YII Shipping Co.*, 2012 WL 6114840, at *4 n.7 (S.D. Fla. Dec. 10, 2012), *aff'd*, 559 F. App'x 841 (11th Cir. 2014))).

### 2. CXC's allegedly sending Hartley to work on *PetroSaudi Saturn*

Hartley also alleged in the trial court that, under the Spencer Ogden Contract, CXC sent Hartley to work on a vessel owned by PetroSaudi and operated by PetroSaudi and its Texas-based subsidiary. Even assuming that Hartley's characterization is accurate, he has not shown that a nonresident that contracts for another nonresident to provide services outside Texas to an entity over which Texas courts have general jurisdiction, on a vessel operated outside Texas by that entity and its Texas-based subsidiary, has engaged in any jurisdictionally relevant conduct under the applicable law. 6CATS and CXC were required to negate only those jurisdictional allegations that, if true, would bring the nonresident defendant within the scope of Texas's long-arm statute. *Bell*, 549 S.W.3d at 559.

### 3. Additional contacts alleged for first time on appeal

For the first time on appeal, Hartley points to additional alleged facts that he argues show that the Spencer Ogden Contract contemplated CXC's purposefully availing itself of the privileges of doing business in Texas.[9] Specifically, Hartley alleges that, under the agreement, CXC was required to and did send invoices to

---

[9] We need not reach the question of whether the allegation that CXC sent invoices to Spencer Ogden can be considered as support for the trial court's ruling because, as discussed below, we hold that, even if Hartley's allegations that CXC contracted with and sent invoices to a Texas resident were both true and properly before the trial court, they would not support the exercise of specific jurisdiction over CXC. *See Caerus Oil & Gas, LLC v. Terra Energy Partners, LLC*, No. 01-22-00191-CV, 2023 WL 2169495, at *15 (Tex. App.—Houston [1st Dist.] Feb. 23, 2023, no pet.) (mem. op.).

22

Spencer Ogden in Texas for Hartley's time logged aboard the *PetroSaudi Saturn*. Hartley also alleges that CXC received payments from Spencer Ogden based on the invoices and that Spencer Ogden sent the payments to CXC from Houston. In addition, Hartley alleges that CXC contractually agreed to perform and pay for training for Hartley, and provided such training in Texas. CXC argues that this Court should not consider these facts because they were not included in Hartley's pleading or response to 6CATS and CXC's special appearance as grounds for exercising jurisdiction over CXC. Hartley argues that the evidence on which he relies was in the record at the time of the trial court's ruling, and that the trial court may consider any evidence on file in ruling on a special appearance.

Because the additional allegations raised by Hartley on appeal are not sufficient to allege purposeful availment by CXC of the privileges of doing business in Texas, we do not need to address the question of whether the allegations were timely raised. Even in a case involving a claim based on allegedly improper invoices, sending invoices to a Texas counterparty is not sufficient grounds on which to exercise specific jurisdiction over a nonresident defendant. *See Caerus Oil & Gas, LLC v. Terra Energy Partners, LLC*, No. 01-22-00191-CV, 2023 WL 2169495, at *15 (Tex. App.—Houston [1st Dist.] Feb. 23, 2023, no pet.) (mem. op.) (in case involving claim based on allegedly improper charges and deductions on invoices sent by nonresident defendant to alleged Texas resident,

23

holding that trial court erred in denying special appearance for reasons including that defendant's contracting with and sending payments and invoices to alleged Texas resident did not support exercise of specific jurisdiction over defendant).[10] And Spencer Ogden's payments to CXC from Houston are unilateral acts that cannot amount to purposeful availment by CXC. *Ashdon, Inc. v. Gary Brown & Associates, Inc.*, 260 S.W.3d 101, 109, 116-17 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (affirming trial court ruling that it did not have specific jurisdiction over nonresident defendant even though defendant received weekly payments in form of checks written in Texas and drawn on Texas banks); *N803RA, Inc. v. Hammer*, 11 S.W.3d 363, 368 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (affirming trial court ruling that it did not have specific jurisdiction over nonresident defendant even though defendant had contracted with Texas corporation and received checks from Texas corporation drawn on Texas bank).

---

[10] The decision in *Hall v. Environmental Chemical Corp.*, 64 F. Supp. 2d 638 (S.D. Tex. 1999), cited by Hartley, is distinguishable for reasons including that, in *Hall*, the plaintiff employee was a Texas resident. The court in *Hall* found that the defendant had "purposely availed itself of the privilege of conducting recruitment and employment activities in Texas" because the nonresident defendant had specifically targeted the Texas market for employment prospects, as a result recruited the plaintiff Texas resident for employment, during the employment period mailed all paychecks to the plaintiff's Texas residence, and for a period paid for medical treatment that the plaintiff received in Texas. *Hall*, 64 F. Supp. 2d at 642-43. CXC's sending invoices to a Texas corporation for work performed by an alleged employee who is not a Texas resident is not a comparable degree of employment-related contact with Texas.

Hartley alleged in the trial court, and also alleges on appeal, that CXC performed work directly related to services that Hartley provided in Houston, Texas, but does not clearly identify the services that Hartley allegedly provided in Houston, or the related work performed by CXC. Hartley appears to be referencing his allegations on appeal that CXC contractually agreed to perform and pay for training for Hartley, and provided such training in Texas. The portions of the record to which Hartley cites as support show at most that CXC agreed to bear the cost of any training that Hartley required in order to perform the services that CXC agreed to provide under the Spencer Ogden Contract. That agreement does not support Hartley's assertion that Hartley received such training in Texas, much less that CXC provided and paid for that training. Moreover, Hartley has not shown that his liability claims relate to any training he may have received in Texas. *See Ford*, 592 U.S. at 359-60 (noting that specific jurisdiction exists only if plaintiff's claims arise out of or are related to nonresident defendant's activity within forum, and that only when a company exercises privilege of conducting activity within a state may the state hold the company to account for related misconduct—permitting the company to structure its conduct so as to lessen or avoid exposure to the state's courts); *Volkswagen*, 669 S.W.3d at 430 (noting that specific jurisdiction exists only if alleged liability arises out of or is related to nonresident defendant's activity within forum).

Because we conclude that Hartley did not allege jurisdictional facts that, if true, would establish that CXC had sufficient contacts with Texas to support the exercise of specific jurisdiction, we do not need to consider the parties' arguments regarding whether CXC's contacts with Texas are also 6CATS's contacts[11] or can be imputed to 6CATS. For the same reason, we do not need to reach the question of whether the exercise of specific jurisdiction over CXC or 6CATS would comport with traditional notions of fair play and substantial justice. *See BMC*, 83 S.W.3d at 795 (stating that exercise of personal jurisdiction over nonresident defendant is constitutional only if defendant has established minimum contacts with forum state and exercise of jurisdiction comports with traditional notions of fair play and substantial justice).

## Conclusion

We conclude that the trial court erred in denying 6CATS and CXC's special appearance. We therefore reverse the trial court's order denying 6CATS and CXC's special appearance and render judgment dismissing Hartley's claims against 6CATS and CXC for lack of jurisdiction. The dismissal of Hartley's claims against 6CATS and CXC is without prejudice. *See Nguyen v. Desai*, 132 S.W.3d 115, 118-19 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (holding that trial

---

[11] Hartley argues on appeal that CXC became 6CATS through a simple name change, and asks the Court to take judicial notice of publicly available documents that it contends support its position.

court erred in dismissing claims with prejudice based on lack of personal jurisdiction over defendant); *see also Wilkerson v. RSL Funding, L.L.C.*, 388 S.W.3d 668, 682 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (rendering judgment of dismissal without prejudice based on ruling that trial court erred in denying special appearance).

Amparo "Amy" Guerra
Justice

Panel consists of Justices Guerra, Guiney, and Johnson.